Good morning. May it please the Court, I'm Anne Fitz with the Federal Defender's Office for the Middle District of Florida, and we represent the appellants in this consolidated appeal. The case at bar asks this Court to determine whether 8 United States Code Section 1326 violates the equal protection guarantee of the Fifth Amendment based on the statute's discriminatory intent and disparate impact on a race-based class of Latino people, including Mexicans. Can I ask you, at some point during your remarks today, address this question for me? You don't need to do it now, but at some point. Let's assume that you're right about the plenary power not applying, and let's assume that Arlington Heights provides the appropriate framework for evaluating your client's equal protection claim. So assume those things as baselines. The issue of discriminatory intent is a question of fact for the trier of fact, and here you have a decision going against you on that finding of fact. Given that the evidence that you present is circumstantial, because you're talking about a legislative body, not a single person acting, how do you show that that finding of fact was clearly erroneous, that it wasn't plausible? Well, Your Honor, in the case below what we had, we had the finding of fact that was based on three isolated pieces of evidence that pertain to the 1952 overall enactment of the INA. That would be the letter from the Deputy Attorney General, it would be President Truman's veto, and also that involved the discounted evidence of the 1929 legislation. You say discounted, but I'm not sure that that's right. Did the magistrate judge believe the evidence was relevant, though not conclusive? So you can't quite say that it was discounted, it was just given less weight. Well, we believe that it was discounted, Your Honor, because the magistrate court was relying on the cases that had gone before. There's been seven circuits that have already decided this issue. There's been a number of district courts. There's only been one district court in Carrillo-Lopez that decided in our favor, Your Honor, on this issue. And essentially what the magistrate court did was instead of looking at a totality of the circumstances under the Arlington Heights test, which is what it was supposed to do, the court only looked at these three isolated pieces of evidence to determine, as all of the other district courts and all of the other circuit courts have, that the 1952 law was not reenacted with the same racial animus that perpetrated the 1929 law. I believe that a finding was also made that during the congressional debate in 1952 there was no mention of illegal reentry, either 1325 or 1326, that was not among the debated sections. And in fact, it wasn't because the debate was really about the quota system. That's correct, Your Honor. So how do you then contest that? Well, and so that's the point that I was going to make, is that under the Arlington Heights framework, here specifically what the court erred in doing was that it incorrectly focused its only on these three pieces of isolated evidence behind the 1952 reenactment of 1326 and failed to consider that in 1952 Congress chose to do nothing to address the discriminatory effect that persisted after the law's original enactment in 1929, which is strong evidence, more than the discounted weight that the magistrate court gave it, that Congress accepted and carried forward the 1929 law's purpose and effect. Had the court properly considered the 1929 enactment of the law along with its legislative history, the historical background, the effect of the law between 1929 and 1952 when it was reenacted, as well as the historical context of the 1952 law, and what I mean about that is there was the introduction of the Bracero Program in the 40s. It was, it was, they reenacted the 1951, in 1951 the Bracero Program, and it doesn't really take into account the fact that from the 1929 bill to the 1952 bill, there were serious changes to the particular statutes. I mean, in the 1929 or 1924 act, there were three different statutory sections, and then in 1952, it became one single offense that subjected all re-entry defendants to the same penalty, two years of imprisonment. I mean, there was a a change in the law. The change was not a substantive change. It just made it easier at the urging of the Department of Justice in 1952 for prosecutions to be made under the 19, under section 1326 for illegal immigrants who were found in the country, which was easier for the Department of Justice to prove jurisdiction and prove their case. Congress couldn't have passed a different facially neutral statute, right? Well, I, as a matter of fact, if it were passed today, you wouldn't complain that it violates equal protection. I would argue, Your Honor, that, well, first of all, you have to look at, at the time the law was enacted, if the same law would be enacted minus the discriminatory intent at the 1952 Congress or the 1929 Congress, either way, depending on what version of the law that you're looking at. The, at the time that the 1952 law was reenacted, the quota system was being developed. And so when you're looking at- How would Congress today pass a law that is free of what you say is discriminatory taint? Well, they would have to have a debate over it. This was a silent reenactment in 1952. There was no debate. There was no committee findings. There was no articulated purpose of the 1952 law without, that acknowledged and rejected the racial animus behind the 1929 law. And granted this panel is bound by the circuit's precedent, specifically Johnson versus Governor of Florida. And in that case, that was a 2005 case, the court did say that it rejected the proposition that any intent to disavow discriminatory intent is needed in order to purge the taint of racial animus. And we've said it again. I'm sorry? We've said it again in the city of Birmingham case. Yes, yes. And also in Thompson versus Alabama as well. Yes, Your Honor. But the dissent in the Thompson case did caution that the 11th Circuit precedent sets a meaningless bar to reenact discriminatory laws and is out of step with the Supreme Court jurisprudence. 1326 has been amended four times since 1950. Not substantively, Your Honor. Every time it has been made to be harsher, the penalties have been harsher against the 99% Latino population that is prosecuted under this law. We're not just talking about finding an illegal immigrant in this country and deporting them. We're talking about criminally prosecuting them, putting them in jail and making sure that they do not have a legal path forward to citizenship in the future. Well, let's talk about that for a second. In your brief, you mentioned and a lot of the amicus briefs also mentioned what you believe is a discriminatory impact of how 1326 is used and prosecuted against Latinos, right? Yes. Okay. But what's missing from your brief and I think from the amicus briefs is the different part of the equation. In other words, how many individuals in the United States are Latino who come back into the United States after having been removed and how many are not Latino? In other words, if you have a situation where, and I'm just making these numbers up for a point. I'm not saying these are the actual numbers. If you have 90% of the immigrant base that is removed and re-enters and is prosecuted and they're Latino, a 90% or so of those prosecution number wouldn't seem overly discriminatory. On the other hand, if you only had 10% of the immigrant base that was Latino coming back into the United States after having been removed, then a 90% prosecution percentage would at least raise eyebrows. Do you know what that number is to compare the percentage that you put forward because you're missing the denominator and without that, the comparison is, it just means nothing. Yes. Well, yes and no, your honor. I don't have the stats that you're asking for. I do know that according to the US Sentencing Commission, their statistics that we have 99% of prosecutions under this law are at that targeted race of Latinos. And the reason that I say yes and no, your honor, is because the law was designed either in 1929 or in 1952 to remove this particular class of Latinos from the country. And it is the same effect that happens today with the, and we can but the United States has, I mean, maybe you don't have the statistics, but I would presume that given its proximity to Mexico and Latin and South America and part to the Caribbean, the US has more immigration, both legal and illegal from those parts of the world than from Europe, Asia, Africa, et cetera. Is that not correct? The Canadian border is double the length of the Canadian border. I can't tell you how many Canadian citizens are entering the country illegally. No. Compared to Latinos from anywhere in Latin or South America. My only suggestion is that without knowing the comparator base at the bottom of the fraction, the number of, the percentage of prosecutions doesn't really tell you much. It just doesn't. It tells us, do we know how many, do we know how many Canadian nationals, for example, reenter the country illegally after having been removed? No, we don't know that. Okay. That's a problem because you don't know what the comparison is as to anyone else. But what we do know is that this law was designed to target specifically the Latino population that is still being targeted by the law, Your Honor. So we do know that. And so in that respect, the invidious intent of the law continues to carry over. And I see that I'm over my time, so I will- You've saved your full time for rebuttal. Yes. Yes. Five minutes for rebuttal, please. Yes. Thank you. Mr. Meisler. Good morning, Your Honors. Scott Meisler for the United States. May it please the court. Seven courts of appeals have rejected the same equal protection challenge to section 1326 that the defendants raised here. They've done so on records directly analogous to the record before this court and under the legal standard that the defendants favor here, which is the Arlington Heights test that we've been discussing this morning. We think that this court can and should follow the same course. I am happy to address questions that the court has about the alternative argument we've made, but I was going to jump straight into the Arlington Heights inquiry unless the court has those questions. I was going to say, we don't need to really reach the standard of review. We can assume Arlington Heights. You can, Your Honor. And multiple other circuits that have addressed this issue have taken exactly that path. And I think really if you're looking at Arlington Heights, there are really three principles that resolve this case. Some of them I recognize have been discussed already today. First is that under precedent, the relevant official action here is the 1952 enactment of section 1326, not the 1929 predecessor statute. Second is that the 1952 act is entitled to a presumption of legislative good faith. And third is the point that Judge Jordan raised at the outset, which is that this court reviews only for clear error. The district court's determination that the 1952 Congress was not motivated in part by discriminatory intent. And I should be candid with the court that that is a standard that cuts both ways. When the district court in the Nevada case mentioned by my friend in Correa Lopez invalidated the statute and the government appealed, we had to show clear error before the Ninth Circuit. So that is a standard that applies either way equally to a losing party in the district court. And here, I do not think that the defendants can come close to establishing clear errors for some of the reasons that have discussed here. The district court did not make a legal error. And that is one way, of course, you can show clear error as if the district court incorrectly applied governing law. But the magistrate judge was plainly aware of the Arlington Heights test, set that out accurately with the kind of threshold question of temporal proximity between the 1929 and 1952 laws. The magistrate judge said, I think as Judge Jordan noted, that the 1929 history, while relevant, was not controlling, was not dispositive, and was entitled to little probative weight here, given the passage of time, and cited a string cite of district courts that had reached a similar conclusion. Another event that occurred between 29 and 52, and that was a massive world war. That's, yes. This statute was enacted during the early stages of the Korean War, while we were concerned about the Soviet Union and other countries invading us surreptitiously, as it were. This is just a different world, is all I'm saying. Yes, Your Honor. And that shows up in the legislative history and some of the discussions we've been mentioning, where one of the big currents you'll see is that some of the sponsors of the legislation, like Senator McCarran, who's often assailed for his views on racial and ethnic questions, but was someone who was very, very focused on subversive activities, communist activities, and that kind of permeates the debates over this law. And that's one of the reasons I think you don't see kind of a singular focus on Section 1326, and the way that some of this court's precedents address felon disenfranchisement laws or voting restrictions that were the focus of a particular moment in legislature here. This was an omnibus bill that covered a lot of territory. I think that's the kind of wisdom the Ninth Circuit brought to bear in the Carrillo Lopez case, explaining why you can't just paint with a broad brush here. 1326 did get legislative attention of the kind we think that I think is generally salutary, right? It went through a process with a lengthy committee report, bills were proposed, the Department of Justice and others commented on them, and then Congress made changes in response to those things before the legislation. But it was not the subject of floor debates, and I think that's significant under Arlington Heights, because it means the defendants cannot come forward, haven't come forward with remarks about 1326 in particular. They have mentioned, sorry. What do you think in terms of the written legislative record that best supports the district courts and the magistrate judges finding that that 1326 on reenactment was not motivated by discriminatory animus? Is there anything in that written legislative record that a committee report or something else, a conference report that sheds any light on this point? I think I would point your honor just to the evolution of the law, right? From the 1950 report just saying carry forward prior law on entry and re-entry to the changes that took place, right? Some of which were consolidating, right? Is to move, convert three penalties into one, as Judge Lagoa pointed out, that made some of that up the penalty for some offenders. It lowered the penalties for other offenders who were subject to a five-year cap, lower to a two-year cap. And then of course, DOJ coming back and saying it via Deputy Attorney General Ford's letter, we're worried about some of the language here as being confusing, and that language was an inexception to liability. So it wasn't just uniformly making the law harsher, it was trying to make it make more sense, make it work. And so I would resist the suggestion that it was just trying to make things easier. There were cases reported to Congress at the time where venue problems, venue issues had arisen in federal prosecutions under 1326, not just on the border, but of sailors. And just to kind of circle back to the 29 legislative history, which hasn't gotten much mentioned in the briefing, this is attached to the defendant's motion. The 1929 Senate report itself flagged the problems that were arising in prosecutions of sailors, of putting them back on boats at government expense. So to Judge Choflat's point, I think we view this now through the modern lens of very difficult border situation, but at the time Congress was thinking a bit more broadly than that, and they were thinking about sailors and the venue problems that had arisen in cases where a boat might dock in Philadelphia, person gets off, they're finally discovered in Baltimore, where do you prosecute them? That's just to say, Judge Jordan, that's a long answer to say, I would look to just the evolution of the statute because it was not the source of congressional focus. I can't point you to a single committee report, but to me it's just the absence of animus and the kind of regular legislative focus there. The defendants say, in trying to fight the court, satisfy the clear error standard, that the mistake the magistrate judge and then the district court made was not giving the 1929 record more weight and thinking that all that mattered was what happened in the 1950s. Can you speak to that? I can, Your Honor, because I think that that's just not accurate about what the magistrate did. I think the magistrate started out by saying, I acknowledge that there was racist derogatory language used in 29. I find that while that evidence is relevant, it's not dispositive or particularly probative here, and I think that's borne out by the analysis. They have to draw the inference that Congress of 52 was fully aware of that and somehow endorsed it. That's exactly right, Judge Schoflot, and that's, I think, one of the teachings of this court's en banc decision in Johnson v. Governor of Florida. I think what they're after is, the plaintiff is, is putting enough evidence so that members of Congress have got to testify, waive their privilege against their immunity, as it were, and testify that they had no intent to discriminate. Well, that would be, I think, impossible, Your Honor, for members from the 50s. But that is the pitch, is it not? That there's enough out there that created a presumption, sort of like McDonnell Douglas in employment cases. Yes, Your Honor, the idea of a prima facie case that has to be rebutted. And that members of Congress have to come on and rebut the presumption. I think, Your Honor, that the presumption is exactly the opposite, and that's what I think I've tried to convey to the court in our briefing under the Supreme Court's decision in Abbott, is a presumption of legislative good faith has to be overcome. And here, I, just to finish the point I was trying to make in response to Judge Jordan, I think the magistrate judge was correct here, both in the way that he constructed his decision and just the reasoning that sister circuits have since then. And that is that we're not just talking about 23 years. I don't think there's a bright line rule of you can consider 22, but not 25. But I do think the court was looking to things that the Supreme Court has considered, such as the turnover in the legislature. And here we have a situation, as the Ninth Circuit documented, in which upwards of 90% of Congress had turned over. And so if we're thinking about, we're doing one of these unusual cases where we're actually looking at the motivations of individual legislatures, which is usually disfavored, but we do that in this unique context. And we should be looking at who those legislatures, legislators were. In this case, we had an almost entirely different body of legislators. I'll mention just quickly, I think, on the point that was discussed at the end about disparate impact, I agree entirely with Judge Jordan's suggestion there. And I think it's just one, the Seventh Circuit in the Viveros-Chavez case that we've cited to the court in a 28-judge letter underscored. The Ninth Circuit also discussed this by reference to an earlier case of theirs, where they had rejected a selective prosecution argument for precisely some of the reasons that were mentioned. And I think it's also supported by the Supreme Court's reasoning in the Regents of California case that has been discussed in the briefs. As the court will recall, that was a case about rescission of the Deferred Action Program, the immigration program. And in that case, the court was pointed to evidence that it would have a disparate effect on Latinos because upwards of 70% of the beneficiaries were Latino. And the court basically acknowledged that some of the points that were made from the bench earlier, that the immigrant population in the U.S. is predominantly Latino. And so a kind of generalized, cross-cutting immigration program can be expected to have what otherwise might be viewed as disproportionate effects. That's all a long way of saying that I think disparate impact evidence is usually most powerful when, as an indicator of discriminatory intent, when you can't explain the disparity for neutral, legitimate reasons. And this is a case where, because of migration patterns and geography, as the Ninth Circuit and others have acknowledged, the disparity is readily explainable by those factors, and therefore I think is not indicative of invidious discrimination. So with that, Your Honors, unless the court has further questions, we would ask that the court affirm and join seven of its sister circuits in upholding Section 1326. Thank you. Thank you very much. So I just want to circle around to this idea of clear error, because I don't think that I was clear enough during my initial presentation of this argument, is that the clear error of the finding of facts that were made by the court is only one part of actually what we were arguing in our briefs. There is a legal error in the application of the Arlington Heights factors. The Arlington Heights factors were not applied under a totality of the circumstances analysis the way that it was supposed to be done, even with regard to the 1952 law, although we do stand by the fact that the 1929 law is the appropriate law that should be analyzed. But what happened with the court actually examining these three individual pieces of evidence, they declined to look at the actual historical context, Your Honor, Judge Joflat, that you were pointing out of what was going on at the time. There was World War II in the 40s. We had the start of the Korean War in the 1950s, and actually the Bracero Program was enacted by the legislature to bring in Latino migrant workers and gave them a two-year work visa. The Bracero Program was renewed in 1951, and what ended up happening was because of the need of labor, because our men in America were off fighting wars. So we needed the immigrant labor. We wanted to bring the Latinos in to do this labor, but we did not want them to establish permanent residences, which is why they were not involved in the quota system in 1952. They were specifically excluded from the quota system, and 1326 provided an opportunity for removal, not just removal, but also criminal punishment for those who overstayed their visas pursuant to the Bracero Program. So none of that was considered, that historical context of the 1952 law. Can I just go back for a second? My understanding of the record was that under the quota system, everyone in the Western Hemisphere was excluded from the quota system. That's correct, yes. So Canadians would also have been included? Yes. Canadians were also included, but actually at that time, historically, there was a pre-certification process that was set up for Canadian immigrants that made it easier for them to be able to be approved to immigrate to the country, and they were not subject to removal. Under the law, they were, but under the execution of the law, they were... You're talking about the application of the law afterwards. That's not a facial challenge. It's a challenge to the way the executive branch applies the law. It's the disparate impact of the law, yes. It's the effect of the law. Yeah, but the disparate impact occurs later after the law is enacted. That's right, Your Honor. But you have a facial challenge, which means you don't take that into account at all. Wait a minute. You would take it into account in moving to dismiss an indictment under 1326? It's a facially neutral law, Your Honor, where we have to show disproportionate effects, which we have. I understand, but you're talking about the effect of the law afterwards, and that's an as-applied challenge, not a facial challenge. Well, no, Your Honor. It is a facially neutral law, but the law itself wasn't acted with a discriminatory purpose. It's a facial challenge. On its face, it's unconstitutional under the Equal Protection Clause. Your Honor, it's an unconstitutional statute under the Fifth Amendment guarantee of incorporated implicit and due process of the Fifth Amendment. It's not pursuant to the... I understand all that, but your argument is based on evidence of the effect afterwards of the 52 law. Which is one of the things that the court should have taken into consideration, which it did not. Judge Choflat's point, I think, is this. When you're talking about a facial challenge to a statute, disparate impact is gleaned from the face of the statute that you are attacking facially. If you are attacking something outside of the four corners of the statute in terms of disparate impact, then you're talking about an as-applied challenge. For example, a facially neutral statute says, facially neutral statute says, only people in this small category are going to be prosecuted for this crime. And it turns out that the only people in that small category are a protected class. Before the government takes any enforcement action whatsoever, that facially neutral law has a significant disparate impact, and you may be able to consider that on a facial challenge. What Judge Choflat, I think, is suggesting to you is you're relying on post-enactment enforcement history, which he thinks may not be amenable to facial considerations. You understand what the difference is? Yes, I do understand. And if I could just address that. Yes, go right ahead. The racial disparity, the impact between 1929 and 1952 that occurred during that period of time is one of those things that should have been considered under a totality of the circumstances in the Arlington Heights analysis that the district court ignored and did not address. So yes, we are looking at the effect of the 1929 law, which carried forward to the 1952 law. And we believe that had the court properly considered the 1929 enactment of the law and all of these other factors in a totality of the circumstances, that the defendants would have met their initial burden under the Arlington Heights analysis, and it would have shifted the burden to the government to prove that the same law would have been enacted without the invidious intent. Thank you. All right. Thank you both very much.  Our next case is number 24-1.